# Illinois Official Reports

## Appellate Court

---

### *People v. Sandifer*, 2016 IL App (1st) 133397

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HENRY SANDIFER, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-13-3397 |
| Filed | October 27, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-1581501; the Hon. Angela M. Petrone, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Amy P. Campanelli, Cook County Public Defender, of Chicago, for appellant.<br><br>Anita M. Alvarez. State's Attorney, of Chicago (Alan J. Spellberg and Jon Walters, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Presiding Justice Ellis and Justice McBride concurred in the judgment and opinion. |

**OPINION**

¶ 1    A jury convicted defendant, Henry Sandifer, of the murder of the victim, L.M., but acquitted him of the charges of sexual assault of the victim. Following a sentencing hearing, the trial court sentenced defendant to 60 years in the Illinois Department of Corrections. Defendant contends on appeal that the trial court erred by (1) interpreting the Illinois rape shield statute to bar testimony regarding the victim's past sexual conduct, (2) admitting the testimony of deoxyribonucleic acid (DNA) match probabilities, (3) allowing the State to present an argument which inflamed the passions of the jury, (4) allowing evidence which referenced defendant's profile being in the state DNA database, and (5) allowing cumulative errors which denied defendant due process. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    Chicago department of streets and sanitation worker Sandra Jones testified that on October 14, 2008, as she unloaded a garbage cart in an alley in the area of 11026 South Normal, she saw a body come out of the garbage cart. The naked body was wrapped in a blanket secured with suspenders around the waist and knees. Darlene Page, the victim's sister, later identified the body at the Cook County Medical Examiner's Office. Page testified that she last saw her sister on the evening of October 10, 2008.

¶ 4    On the evening of October 11, 2008, Maria Cintron, defendant's former girlfriend, was with the victim at the home of Larry Mays at 10813 South Wallace. Cintron and the victim smoked crack cocaine with Larry and his brother, Michael Mays. Cintron testified that the victim ran out of money, wanted more drugs, and begged Larry for more drugs. Cintron had previously told detectives that after Larry gave the victim four or five bags of crack, Larry and the victim went into Larry's mother's bedroom and closed the door. When the victim came out of the bedroom, the victim begged for more crack. Larry and Michael refused to give the victim any more drugs. When the victim began making a scene, Michael punched her in the face. The victim fell to the ground. Michael then picked her up by the neck, dragged her outside and pushed her down the stairs. Cintron helped her up from the ground. The victim stood up and was able to walk. Both Cintron and the victim left, walking in opposite directions.

¶ 5    Five years prior, in 2003, Cintron lived with the defendant at 11036 South Normal, a few doors down from where the streets and sanitation worker found the victim's body. In 2008, she and defendant were still involved in a sexual relationship. The house on Normal where they used to live was vacant and under repair. They would climb in a back window to access the house to sleep and have sex there.

¶ 6    Detective Tim Murphy interviewed Cintron and learned about what transpired on the evening of October 11, 2008. He then interviewed Larry and another frequent guest of Mays, Jeffery Miles. Both gave a DNA sample to Detective Murphy.

¶ 7    Dr. Valerie Arangelovich from the Cook County medical examiner's office performed the autopsy of the victim's body. Dr. Arangelovich believed that the victim had been dead for at least 36 hours at the time the body was found, putting the date of her death on approximately October 12, 2008. The X-rays revealed no fractures. She determined the cause of death to be strangulation, most likely by hand. The toxicology report revealed that the victim had a blood alcohol level of .184, well above the legal limit of .08. Tests showed the presence of cocaine.

Dr. Arangelovich estimated that her death occurred 30 to 60 minutes after she ingested the cocaine. She did not see evidence in the body which would indicate chronic cocaine use.

¶ 8 Meredith Misker, a forensic scientist for the Illinois State Police Crime Lab, testified that a male DNA sample was found in the victim's vagina, anus, and under her right hand fingernail clippings. All three of these male DNA evidentiary samples came from the same individual. The defendant could not be eliminated as the source. Based on her DNA analysis, Misker found that the defendant's DNA was present on the suspenders found with the victim's body. Defendant's DNA profile matched the profile from the victim's vaginal swab. The frequency of a random person matching the profile was 1 in 340 trillion black, 1 in 15 quadrillion white, or 1 in 9.2 quadrillion "Hispanic" unrelated individuals.

¶ 9 On April 22, 2009, Detective Murphy learned from the Illinois State Police that defendant's DNA was in the state's database. He interviewed defendant on July 20, 2009. The jury watched a redacted video of the interview. Defendant denied repeatedly that he knew the victim, and he denied that he had ever met her or that he recognized her photo. He repeatedly denied that he had sex with the victim. He could not explain the presence of his DNA on her body.

¶ 10 Detective Murphy learned during the course of the investigation that defendant lived at 11036 South Normal and that the victim's body was recovered in the alley at 11026 South Normal. The parties stipulated that in October 2008, around the time of the murder, defendant gave a police officer his address as 11036 South Normal.

¶ 11 The jury convicted defendant of first degree murder but acquitted him of criminal sexual assault. This appeal followed.

¶ 12 ## II. ANALYSIS

¶ 13 On appeal, defendant argues the trial court erred by (1) interpreting the rape shield statute to bar testimony regarding the victim's past sexual conduct, (2) admitting the testimony of DNA match probabilities, (3) allowing the State to present an argument which inflamed the passions of the jury, (4) allowing evidence which referenced defendant's profile being in the state DNA database, and (5) allowing cumulative errors which denied defendant due process. We address defendant's arguments in turn.

¶ 14 ### A. Rape Shield Statute Evidence

¶ 15 In his first claim on appeal, defendant challenges the trial court's rulings with respect to two pieces of evidence relating to the victim's prior sexual activity under the Illinois rape shield statute, section 115-7 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7 (West 2012)).

¶ 16 Initially, defendant contends that the rape shield statute is inapplicable here because it does not apply when the victim is deceased. Without citation to any authority, he argues that the statute is ambiguous in that it does not state that it applies equally to both living and deceased victims and should therefore not apply where the victim of a sexual assault has also been murdered. He argues that barring evidence of a deceased victim's sexual conduct is inconsistent with the legislature purpose of the statute, *i.e.*, prevention of harassment and victimization of a rape victim.

¶ 17    However, defendant did not raise this basis for admissibility in the trial court. Accordingly, he has forfeited this argument on appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (to preserve an issue for review, defendant must raise the issue in the trial court and include it in a posttrial motion). Nevertheless, "forfeiture is not an absolute bar to our review. Instead, forfeiture presents limitations on the parties, not reviewing courts." *People v. Scott*, 401 Ill. App. 3d 585, 599 (2010). "Furthermore, Supreme Court Rule 615(a), which codifies the plain-error doctrine, provides an exception affording review for those issues otherwise subject to procedural default." *Id.* As our supreme court explained in *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007), plain-error review allows consideration of unpreserved error when (1) a clear, obvious error occurred and the evidence was closely balanced, or (2) regardless of the closeness of the evidence, a clear, obvious error occurred which was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. The defendant bears the burden of establishing plain error. *Scott*, 401 Ill. App. 3d at 599-600. We must necessarily first determine whether an error occurred, and we "therefore, consider the substance of each claim of error." *Id.* at 600.

¶ 18    Defendant's argument requires us to first address the statutory construction of the rape shield law. We review questions of statutory construction *de novo*. *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 70. "The primary goal of statutory construction is to ascertain and give effect to the intent of the legislature." *Id.* We construe the statute as a whole and give words their plain and ordinary meaning, and avoid rendering any language meaningless or superfluous. *Id.* We consider portions of the statute in light of other relevant provisions, and we presume "the legislature did not intend the statute to have absurd, inconvenient, or unjust consequences." *Id.* We may also consider "the reason and necessity for the law, the evils sought to be remedied and the purpose to be achieved." *Id.*

¶ 19    The Illinois rape shield statute provides in pertinent part:

"§ 115.7. a. In prosecutions for *** aggravated criminal sexual assault, criminal sexual assault, aggravated criminal sexual abuse, criminal sexual abuse, or criminal transmission of HIV *** the prior sexual activity or the reputation of the alleged victim *** is inadmissible except (1) as evidence concerning the past sexual conduct of the alleged victim *** with the accused when this evidence is offered by the accused upon the issue of whether the alleged victim *** consented to the sexual conduct with respect to which the offense is alleged; or (2) when constitutionally required to be admitted.

b. No evidence admissible under this Section shall be introduced unless ruled admissible by the trial judge after an offer of proof has been made at a hearing to be held in camera in order to determine whether the defense has evidence to impeach the witness in the event that prior sexual activity with the defendant is denied. Such offer of proof shall include reasonably specific information as to the date, time and place of the past sexual conduct between the alleged victim *** and the defendant. Unless the court finds that reasonably specific information as to date, time or place, or some combination thereof, has been offered as to prior sexual activity with the defendant, counsel for the defendant shall be ordered to refrain from inquiring into prior sexual activity between the alleged victim *** and the defendant. The court shall not admit evidence under this Section unless it determines at the hearing that the evidence is relevant and the probative value of the evidence outweighs the danger of unfair

prejudice. The evidence shall be admissible at trial to the extent an order made by the court specifies the evidence that may be admitted and areas with respect to which the alleged victim *** may be examined or cross examined." 725 ILCS 5/115-7 (West 2012).

¶ 20 Accordingly, the Illinois rape shield law "absolutely bars evidence of the alleged victim's prior sexual activity or reputation, subject to two exceptions: (1) evidence of past sexual activities with the accused, offered as evidence of consent; and (2) where the admission of such evidence is constitutionally required." *People v. Santos*, 211 Ill. 2d 395, 401-02 (2004). In the present case, the second exception is at issue.

¶ 21 Under defendant's proposed interpretation, as long as the victim is dead, all prior sexual conduct of the victim would not be subject to the rape shield statute's prohibitions. It is true that, as defendant argues, one of the legislature's purposes in enacting the rape shield statute was to "prevent the defendant from harassing and humiliating the complaining witness with evidence of either her reputation for chastity or specific acts of sexual conduct with persons other than [the] defendant." (Internal quotation marks omitted.) *People v. Johnson*, 2014 IL App (2d) 121004, ¶ 42 (quoting *People v. Summers*, 353 Ill. App. 3d 367, 373 (2004)).

¶ 22 If this were the singular purpose of the statute, defendant would be correct that if the victim is dead, the purpose of the statute would not be furthered by applying it to deceased victims. However, another well-recognized purpose of the rape shield statute is to prevent the admission of evidence which is not relevant to the issue at hand, namely, whether or not the defendant, at the specific date and time alleged, committed the offense of sexual assault. As our supreme court recognized in *People v. Sandoval*:

" 'The State policy underlying the rape shield statute *** is to prevent the defendant from harassing and humiliating the prosecutrix at trial with evidence of either her reputation for chastity or specific acts of sexual conduct with persons other than the defendant, since such evidence has no bearing on whether she consented to sexual relations with the defendant. *Further, exclusion of such evidence keeps the jury's attention focused only on issues relevant to the controversy at hand.* Last, but not necessarily least, the exclusion promotes effective law enforcement because victims can report crimes of rape and deviate sexual assault without fear of having the intimate details of their past sexual activity brought before the public.' " (Emphasis added.) *People v. Sandoval*, 135 Ill. 2d 159, 180 (1990) (quoting *People v. Ellison*, 123 Ill. App. 3d 615, 626 (1984)).

¶ 23 Accordingly, the statute seeks to prevent the nullification of a victim's testimony, or a disregard of the victim, based on her prior conduct, which may or may not be germane to the guilt or innocence determination of the defendant. "Both the legislature and the courts have found that a complainant's prior sexual history is irrelevant in a trial for sexual assault." *Sandoval*, 135 Ill. 2d at 182. As noted by the Second District in *Johnson*, " 'The true question is always one of relevancy' [citation], and '[t]he alleged victim's sexual history is not constitutionally required to be admitted unless it would make a meaningful contribution to the fact-finding enterprise' [citation]." (Internal quotation marks omitted.) *Johnson*, 2014 IL App (2d) 121004, ¶ 42. Keeping irrelevant and prejudicial evidence from the jury is a valid purpose, regardless of whether the victim is deceased or living. Therefore, we find that the rape shield statute applies when the victim of a sexual assault is deceased. To find otherwise would defy common sense.

¶ 24    Since we find that the rape shield statute applies where the victim is murdered, we now turn to whether the court erred in its rulings under the statute. Defendant argues that Miles's proposed testimony that he sold drugs to the victim occasionally, within a month of the murder, and had sex with the victim in exchange for drugs, was admissible under the statute.

¶ 25    The record reflects that when questioned about Miles's proposed testimony by the trial court, defense counsel had no information that Miles had sex with the victim on the night of her murder, and indicated that it was "weeks or a few months" before the murder when Miles exchanged sex for drugs with the victim. The trial court excluded this evidence as violating the rape shield statute.

¶ 26    It is well-settled that "[e]videntiary rulings made pursuant to the rape-shield statute are reviewed for an abuse of discretion." *Id.* (citing *Santos*, 211 Ill. 2d at 401). Similarly, "[a] trial court's restriction of cross-examination will not be reversed absent an abuse of discretion." *People v. Price*, 404 Ill. App. 3d 324, 330 (2010) (citing *People v. Enis*, 139 Ill. 2d 264, 295 (1990)). An abuse of discretion " 'occurs where the trial court's decision is arbitrary, fanciful or unreasonable [citation] or where no reasonable person would agree with the position adopted by the trial court.' " *Johnson*, 2014 IL App (2d) 121004, ¶ 42 (quoting *People v. Becker*, 239 Ill. 2d 215, 234 (2010)).

¶ 27    Defendant argues that the proposed testimony from Miles would have supported his defense that, although defendant's DNA was the only DNA found inside the victim's body, this was the result of a consensual sexual encounter with defendant a few days before the murder, and another perpetrator was responsible for murdering the victim, as the Mayses and Miles had the opportunity and motive to kill her. Defendant argues that the fact that Miles had sex with the victim in exchange for drugs supported the defense theory that the defendant may have had a brief sexual encounter with the victim in the context of prostitution, but defendant did not know her further and did not kill her. It would also explain the presence of defendant's DNA in the victim's sex organs, even though he claimed that he did not recognize her. According to the defendant's argument, the prosecution argued that defendant was guilty because he denied recognizing the victim, and a sexual encounter in the context of a brief prostitution encounter would have explained this situation to the jury favorably for the defendant. By denying the defense the opportunity to present this important evidence, the defense contends that the court unfairly infringed on the defendant's constitutional rights to present a full defense.

¶ 28    The "when constitutionally required" exception at issue here "requires that a defendant be permitted to offer certain evidence which [is] directly relevant to matters at issue in the case, notwithstanding that it concern[s] the victim's prior sexual activity." (Emphasis and internal quotation marks omitted.) *Id.* Nevertheless, the rape shield statute requires the defendant to make an offer of proof which "include[s] reasonably specific information as to the date, time and place of the past sexual conduct between the alleged victim *** and the defendant." 725 ILCS 5/115-7(b) (West 2012). If a trial court denies a motion to introduce evidence pursuant to the rape shield statute, the defendant bears the burden of providing an adequate offer of proof which is "considerably detailed and specific" in order to preserve the claim for appeal. (Internal quotation marks omitted.) *People v. Patterson*, 2014 IL 115102, ¶ 118. See *People v. Grant*, 232 Ill. App. 3d 93, 103-05 (1992) (defendant waived the issue of whether prior sexual conduct by the victim was admissible to explain or rebut medical evidence because he failed to make an adequate offer of proof with specific information regarding the date, time, or location

- 6 -

of alleged sexual contact regarding his allegation that the semen found in the victim's vagina was deposited by her boyfriend).

¶ 29    Moreover, even when admissible under the rape shield statute, "the determination of whether the details of the sexual activity were admissible remained subject to standards of relevancy." *People v. Schuldt*, 217 Ill. App. 3d 534, 541 (1991). The court may reject the proffered evidence on grounds of relevancy "if it is of little probative value because of remoteness, uncertainty or conjectural nature. [Citation.] Whether evidence offered by a defendant is relevant is a determination within the sound discretion of the trial court." *Id.* at 540-41.

¶ 30    Here, the defense's offer did not satisfy the requirements of section 115-7(b) of the rape shield statute. The defense provided no information that Miles had sex with the victim on the night she was murdered or near the time that she was murdered. The defense only offered an approximate time, *i.e.*, that it was "weeks or a few months" before the murder when Miles exchanged sex for drugs. The defense failed to provide any specifics regarding date, time, and place that the interactions between the victim and Miles took place. As the statute states, no evidence is admissible unless it includes reasonably specific date, time and place of the past sexual conduct between the victim and the defendant. Defendant failed to make an adequate offer of proof regarding date, time, and place of any sexual encounter between the victim and Miles in order to establish its relevancy. The court clearly did not abuse its discretion in excluding this testimony.

¶ 31    Further, defendant was nevertheless permitted to elicit some testimony from Miles which supported this defense, even if it did not include the specific allegation that she exchanged sex for drugs with him sometime within the prior several months before her murder. Miles testified that he stayed at Larry's house in October 2008, and that he sold drugs to the victim, that he had her ID card on October 12 because he was holding it as "security" for receiving payment for the drugs, and he still had it in his possession on the date of her disappearance. This testimony nevertheless could have demonstrated that Miles had a motive to kill her based on a failure to pay for drugs.

¶ 32    In that regard, we further conclude that the trial court's exclusion of this evidence did not violate defendant's confrontation rights. "It is well established that a trial judge retains wide latitude insofar as the confrontation clause is concerned to impose reasonable limits on *** cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or of little relevance." *People v. Harris*, 123 Ill. 2d 113, 144 (1988) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis in original.) *Id.* at 144-45. (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). The rape shield statute's exception allowing evidence of prior sexual activity "when constitutionally required" allows a defendant to enter evidence "*directly* relevant to matters at issue in the case." (Emphasis in original and internal quotation marks omitted.) *Johnson*, 2014 IL App (2d) 121004, ¶ 42. A victim's sexual history "is not constitutionally required to be admitted unless it would make a meaningful contribution to the fact-finding enterprise." (Internal quotation marks omitted.) *Id.* (quoting *People v. Maxwell*, 2011 IL App (4th) 100434, ¶ 76). Here, defendant was not deprived of an opportunity to fully confront the witnesses against him or the ability to present a complete defense.

¶ 33   Next, we address defendant's claim that the trial court improperly precluded under the rape shield statute testimony by Cintron. The defense sought to elicit testimony by Cintron that she was using drugs at a drug house with the victim, Larry, and Michael; that the victim entered a bedroom with Larry; that Cintron heard "what she characterized as sex noises"; and that, upon emerging from the room, the victim asked for more drugs and was attacked by Michael. If called as a witness, Larry would not corroborate those events.

¶ 34   However, we find that defendant forfeited this issue by failing to include it in a posttrial motion. *Enoch*, 122 Ill. 2d at 186.

¶ 35   Nevertheless, we note that the trial court held that the rape shield statute permitted evidence of the victim's prior sexual conduct where it was constitutionally required if it goes to the defense. The trial court noted the defense theory was that Larry or Michael had something to do with the murder. The trial court allowed the admission of Cintron's testimony that the victim went into a bedroom with Larry, and before they entered the bedroom, Larry gave the victim additional drugs. The trial court reasoned that, if there was evidence of an attack on the victim, Cintron could testify to the sounds she heard from the other room, but without characterizing the sounds as "sex sounds." At trial, however, Cintron testified to these events, except that defense counsel never elicited what, if any, sounds she heard emanating from the other room. Therefore, he cannot now argue that the trial court somehow abused its discretion because he never asked the question. We find no abuse of discretion.

¶ 36   In sum, we find that the trial court did not abuse its discretion in precluding the testimony of Miles and limiting the testimony of Cintron pursuant to the rape shield statute.

¶ 37                                    B. DNA Evidence

¶ 38   In his next claim, defendant contends that the State improperly manipulated the presentation of the DNA evidence which resulted in the jury being given a skewed probability of defendant being the donor of the DNA found on the victim's body.

¶ 39   The prosecution's knowing presentation of false testimony violates due process. *People v. Cornille*, 95 Ill. 2d 497, 509 (1983). Further, "[t]he prosecution is afforded wide latitude in making closing arguments so long as the comments made are based on the evidence or reasonable inferences drawn therefrom." *People v. Gonzalez*, 388 Ill. App. 3d 566, 587 (2008).

¶ 40   The record reflects that DNA was found and tested on four different parts of the victim's body. It was found in her vagina and anus, under her fingernails and on the suspenders which held the blanket wrapped around her dead body.

¶ 41   DNA expert witness Ruben Ramos testified that the evidentiary sample taken from suspenders used to tie the blanket had the DNA of three or more individuals. Ramos stated that defendant could not be excluded as a contributor to the mixture of DNA found on the suspenders, meaning he was included as a possible source. He testified that the frequency of a random person being included as a donor to the mixture from the suspenders was approximately 1 in 15 black, 1 in 17 white, or 1 in 15 "Hispanic" unrelated individuals. He testified that these individuals cannot be excluded from having contributed to the mixture. A comparison with defendant's DNA profile showed he could not be excluded and was therefore included as a possible donor to the mixture. Ramos testified on cross-examination by defense counsel that he would expect 1 in 15 from a group of randomly assembled, non-related individuals to have a DNA profile consistent with a profile in the mixture. In addition to the

probability of inclusion, 1 in 15, Ramos also gave a statistic known as the complementary value, or probability of exclusion: 14 of 15.

> "DNA probability calculations have long been generally accepted and admissible. *People v. Lipscomb*, 215 Ill. App. 3d 413 (1991). See also *People v. Dalcollo*, 282 Ill. App. 3d 944, 960 (1996) (holding that the FBI's calculation of statistical probabilities, as derived by the product rule, is generally accepted in the scientific community). Such DNA statistics are admissible as relevant to identification, and any challenge to their reliability usually goes only to the weight to be given to the evidence. *People v. Redman*, 135 Ill. App. 3d 534, 540 (1985)." *People v. Pike*, 2016 IL App (1st) 122626, ¶ 48.

> "In cases of mixed DNA samples, as we have here, the DNA Advisory Board has endorsed two methods for calculating statistical ratios: (1) the combined probability of inclusion (or its reverse, the combined probability of exclusion) calculation or (2) the likelihood ratio calculation. DNA Advisory Board, [Statistical and Population Genetics Issues Affecting the Evaluation of the Frequency of Occurrence of DNA Profiles Calculated from Pertinent Population Database(s), 2 Forensic Sci. Comm. No. 3 (2000)]." *Id.* ¶ 55.

¶ 42 Defendant asserts that somehow the State took these numbers and told the jury that the probability that defendant was the source of the DNA was .933. After reading through the testimony of Ramos and all of the arguments, it is clear that this calculation was never presented to the jury. The testimony of Ruben Ramos giving the probability of inclusion/exclusion regarding the mixture of DNA profiles on the suspenders did not amount to the "prosecutor's fallacy" that defendant asserts occurred.

¶ 43 A "prosecutor's fallacy" occurs when the probability of inclusion/exclusion is combined to result in a higher probability that defendant was the source.

> "A common mistake in attempting to understand the varying DNA statistical probability calculations is to conflate either a probability of inclusion/exclusion, or a random match probability, with the probability (or likelihood ratio) that a particular defendant is or is not the source of the DNA. This mistaken assumption is referred to as the 'prosecutor's fallacy,' which 'is the assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample.' *McDaniel v. Brown*, 558 U.S. 120, 128 (2010) (quoting National Research Council, Committee on DNA Forensic Science, The Evaluation of Forensic DNA Evidence 133 (1996))." *Id.* ¶ 61.

¶ 44 That did not occur here. No testimony was elicited and no argument was advanced that conflated the statistics and gave a skewed calculation regarding the probability of defendant's DNA being present on the suspenders.

¶ 45 As defendant's argument has no merit, we need not address the issue of whether his counsel was ineffective for failing to object to this testimony and argument. *People v. Holmes*, 397 Ill. App. 3d 737, 745 (2010).

¶ 46                                    C. Closing Arguments

¶ 47 Defendant asserts that the prosecution made six statements in closing arguments that resulted in reversible error. Specifically, defendant argues the State attempted to inflame the

passions of the jury against him when the prosecutor stated as follows: "Folks, you got to meet a rapist and a murderer in this courtroom and you're lucky that you got to do it here."

¶ 48    Defendant also complains about four comments the State made regarding the victim, positing they were designed solely to evoke sympathy and were not relevant to any issues in the case. Specifically, defendant challenges the following statement: "Folks, [L.M.] is all of us. She was a human being and she didn't deserve what happened to her on that horrible weekend in October of 2008."

¶ 49    Later, the prosecution told the jury, "[d]on't forget [L.M.] is a human being. Don't forget no matter what they say about her that she is a human being found in a garbage can and his DNA is all over her body."

¶ 50    The State also argued as follows:

"[L.M.] held a job, people loved her, she had children. She had her faults, drugs one of them, alcohol, but like any of those were not the end and didn't cause the end of her life. They may have affected her judgment but they just left her susceptible and she couldn't have ever imagined or even understood or predicted what she would ultimately end up being, discarded like a piece of garbage, discarded by him."

¶ 51    During rebuttal, the State made the following comments.

"You heard from Darlene Page she lived with her cousin, her other cousins, cousin's mother, four children, two older, she worked Monday through Friday. This isn't somebody who's living in a dumpster. This isn't somebody who doesn't have a personality, engaging. You heard Jeffrey Miles, she's a nice lady, she had friends, but she had a habit, an addiction. It's all too common. That made her susceptible to that person on the south side of Chicago."

¶ 52    In addition to challenging the State's comments regarding defendant and the victim, defendant also claims the prosecution made "critical misstatements of fact" when it made the following argument: "Here's a guy who's sleeping there every night according to Maria Cintron."

¶ 53    Prosecutors have wide latitude in closing arguments and may "comment on the evidence and any fair, reasonable inferences it yields." *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). A closing argument must be viewed in its entirety and any challenged remarks must be viewed in context. *Id.* In reviewing comments made during closing arguments, this court asks whether or not the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them. *People v. Nieves*, 193 Ill. 2d 513, 533, (2000). Prosecutorial misconduct in closing arguments warrants reversal if the improper remarks constituted a material factor in the defendant's conviction. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). In other words, if the jury could have reached a contrary verdict had the improper remarks not been made, or we cannot say the improper remarks did not contribute to the conviction, we should grant a new trial. *Id.*

¶ 54    The standard of review for closing arguments is currently unclear. *People v. Kelley*, 2015 IL App (1st) 132782, ¶ 74.

"Our supreme court has held: 'Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo.*' *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007). However the supreme court in *Wheeler* cited with approval *People v. Blue*, 189 Ill. 2d 99 (2000), in which the

supreme court had previously applied an abuse of discretion standard. *Wheeler*, 226 Ill. 2d at 121. In *Blue* and numerous other cases, our supreme court had held that the substance and style of closing argument is within the trial court's discretion, and will not be reversed absent an abuse of discretion. *Blue*, 189 Ill. 2d at 132 ('we conclude that the trial court abused its discretion' by permitting certain prosecutorial remarks in closing); *People v. Caffey*, 205 Ill. 2d 52, 128 (2001); *People v. Williams*, 192 Ill. 2d 548, 583 (2000); *People v. Armstrong*, 183 Ill. 2d 130, 145 (1998); *People v. Byron*, 164 Ill. 2d 279, 295 (1995). Our supreme court has reasoned: 'Because the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks, the scope of closing argument is within the trial court's discretion.' *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Following *Blue* and other supreme court cases like it, this court had consistently applied an abuse of discretion standard. *People v. Tolliver*, 347 Ill. App. 3d 203, 224 (2004); *People v. Abadia*, 328 Ill. App. 3d 669 (2001)." *Id.* ¶ 75.

¶ 55    The *Kelley* court explained that subsequent to *Wheeler*, "appellate courts have been divided regarding the appropriate standard of review." *Id.* ¶ 76. Ultimately, however, the *Kelley* court found it was not required to resolve the dispute regarding the appropriate standard of review because, under either standard, its holding was the same. *Id.* Likewise, here, we need not resolve the appropriate standard of review because whether considering the State's closing arguments *de novo* or for an abuse of discretion, our holding is identical.

¶ 56    First, we find defendant has forfeited review of all but one of the State's arguments where he did not object at trial or include those arguments in his posttrial motion. See *People v. Thompson*, 238 Ill. 2d 598, 611 (2010) (to preserve an issue for review, a defendant must both object at trial and raise the issue in a written posttrial motion). Generally, we may review unpreserved claims of error pursuant to the plain-error doctrine. *Id.* at 613. However, defendant does not invoke the plain-error doctrine in his brief. A defendant carries the burden of establishing plain error (*People v. Wilmington*, 2013 IL 112938, ¶ 43), and a defendant "who fails to argue for plain-error review obviously cannot meet his burden of persuasion" (*People v. Hillier*, 237 Ill. 2d 539, 545 (2010)). Accordingly, based on his failure to argue for plain-error review, we honor defendant's procedural default. See *id.*

¶ 57    In addition, even if we were to consider defendant's contentions, we would find them meritless. With respect to the State's comments about the victim, we note defense counsel made similar comments during his own opening statement and closing argument. For example, counsel stated that "[L.M.] did lead an unconventional life. During the workweek she was responsible. She showed up to her job. She was gainfully employed. She was a member of a family. She actively raised her children. But come the weekend, [L.M.] was a very different person." Later, defense counsel stated, "[T]here is no question, [L.M.] suffered a violent death. It's a death no person deserved, and she suffered the death at the hands of these crack dealers." During closing argument, counsel stated he was "not saying that anything that happened to her was justified." Given the similarity between defense counsel's comments and the State's comments, it is disingenuous for defendant to challenge the State's comments on appeal.

¶ 58    Further, "the mere mention of the deceased's family does not *per se* entitle a defendant to a new trial." *People v. Jones*, 2011 IL App (1st) 092529, ¶ 33. When testimony in a murder case respecting the fact that the deceased has left behind a spouse and family is not elicited incidentally, but is presented in a manner as to cause the jury to believe it is material, its

admission is highly prejudicial and generally constitutes reversible error. *People v. Harris*, 225 Ill. 2d 1, 31 (2007). However, a "distinction exists between making the jury aware of the family left behind and cases where the prosecution has dwelt upon the deceased's family to the point that the jury would have related that evidence to the defendant's guilt." (Internal quotation marks omitted.) *People v. Jones*, 2011 IL App (1st) 092529, ¶ 33. Here, the State's comments about the victim's family were not so substantial that they would cause the jury to relate evidence regarding her family to defendant's guilt, particularly where defense counsel also commented about the victim's family. Moreover, the State is entitled to comment on the evil effects of the crime and urge the jury to administer the law without fear. *People v. Deramus*, 2014 IL App (1st) 130995, ¶ 55. In light of the foregoing, and based on the wide latitude to which prosecutors are entitled during closing argument, it was not improper for the State to remind the jury that even though the victim was a drug addict, she was a human being and her murder called for justice.

¶ 59    In any event, even if error occurred, the evidence against defendant was overwhelming such that the outcome of his trial would not have been different absent the State's remarks. See *Wheeler*, 226 Ill. 2d at 123 (improper comments do not constitute reversible error unless they were a material factor in the defendant's conviction). Defendant's DNA was found in the victim's vagina and rectum and under her fingernails, while the DNA of any other man was not. Defendant was a possible contributor of DNA on the suspenders found with the victim's body; she was found naked in a garbage can a few houses down from where defendant lived. Thus, defendant's conviction was clearly based on the substantial evidence against him and not on the remarks by the prosecution.

¶ 60    We also find the State did not commit reversible error when it stated, "Here's a guy who's sleeping there every night according to Maria Cintron." Defendant argues there was no evidence as to how often he stayed at 11036 South Normal, nor did the evidence clearly establish his whereabouts in the few days after the victim attended the Mays residence.

¶ 61    The State's argument was a proper inference based on the evidence presented. The parties stipulated that in October 2008, around the time of the murder, defendant gave a police officer his address as 11036 South Normal. Further, Cintron testified that she and defendant were involved in a relationship and had sex at the house on Normal. Cintron described their routine of climbing in a window to access the house to sleep and have sex there. The State's assertion that defendant slept in the home "every night according to Maria Cintron" was a proper comment based on this evidence, even though Cintron did not actually testify defendant slept at the home every night. Moreover, even assuming the State's argument was improper, reversal would not be warranted based on the reasons previously detailed.

¶ 62    We now turn to the sole argument that is properly before our court, *i.e.*, the State's comment to the jurors that they "got to meet a rapist and a murderer in this courtroom" and were "lucky" that they "got to do it here."

¶ 63    As previously described, prosecutorial comments based on facts in evidence or reasonable inferences drawn therefrom fall within the bounds of proper argument. *Glasper*, 234 Ill. 2d at 204. Here, the State's characterizations of defendant as a "rapist" and "murderer" were proper comments based on the reasonable inferences to be drawn from the evidence presented. See *People v. Jackson*, 2012 IL App (1st) 092833, ¶ 45 (the State's reference to the defendant as a "rapist" and "child molester" were reasonable inferences drawn from the specific acts the defendant committed); *People v. Pursley*, 284 Ill. App. 3d 597, 607 (1996) (the prosecutor

could have drawn the inference that the defendant was an "executioner" from the facts of the case).

¶ 64　　Further, to the extent the State's comments could be construed as attempting to elicit fear of the defendant in the jurors, defense counsel objected to the comment and the court sustained counsel's objection, immediately instructing the jurors to disregard the statement. In addition, the trial court admonished the jury before trial and again before closing arguments that arguments are not evidence and should not be considered as evidence. The court further instructed the jury that statements or arguments not based on the evidence should be disregarded. "[T]he prompt sustaining of an objection combined with a proper jury instruction usually is sufficient to cure any prejudice arising from an improper closing argument." *People v. Nielson*, 187 Ill. 2d 271, 297 (1999). Here, any prejudice that may have resulted to defendant was cured by the trial court's sustaining of defendant's objection, its admonishment to the jury to disregard the statement, and its instructions to the jury that arguments are not evidence and that arguments not based on the evidence should be disregarded. See *People v. Peeples*, 155 Ill. 2d 422, 482 (1993) (where the jury was at least twice instructed that opening statements are not evidence and that it should disregard any statement not based on the evidence, any alleged error in the prosecutor's reference to the defendant as a "human predator" was cured).

¶ 65　　Finally, as previously detailed, in light of the overwhelming evidence against defendant, the outcome of his trial would not have been different absent the State's remarks. See *Wheeler*, 226 Ill. 2d at 123 (improper comments do not constitute reversible error unless they were a material factor in the defendant's conviction). Accordingly, reversal is not warranted based on any of the State's arguments.

¶ 66　　　　　　　　　　　　　　D. Videotaped Interview

¶ 67　　The trial court did not err in allowing the introduction of defendant's partially redacted videotaped interview with the police; nor did the contents of the videotape violate defendant's constitutional rights.

¶ 68　　Defendant contends that the videotaped interview shown to the jury contained highly prejudicial content that violated his right to due process and his right against self-incrimination. Defendant maintains that on the video, the interviewing officer repeatedly indicated that defendant's DNA was on file in the DNA database, which improperly implied that defendant's DNA was in that database because he had been previously convicted of a criminal offense. Defendant further contends that the video concluded with the interviewing officer asking him, "Ok. What's your side?" which improperly shifted the burden of proof to defendant and drew attention to the fact that defendant exercised his right to remain silent. The State responds that defendant forfeited review of any alleged error regarding the videotaped interview by not objecting to it at trial or raising the issue in a posttrial motion. The State further asserts that the references to defendant's DNA being on file in the DNA database were not prejudicial, and that there was no improper comment on defendant's right to remain silent where defendant did not exercise his right to remain silent and instead willingly spoke to the officers.

¶ 69　　In order to preserve an issue for appeal, a defendant must specifically object at trial and raise the specific issue again in a posttrial motion. *People v. Woods*, 214 Ill. 2d 455, 470 (2005). In this case, defendant did not object to the officer's comments regarding the DNA evidence, nor did he raise any objection to the redacted video being played for the jury.

Furthermore, defendant failed to raise the specific issue he now complains of on appeal in a posttrial motion. Accordingly, we find that defendant has forfeited this issue for review.

¶ 70     Even if we were to consider this issue, we find that defendant's contentions are without merit. Defendant initially asserts that the trial court erred in not redacting references to defendant's DNA profile being on file in the DNA database. The decision whether to admit evidence cannot be made in isolation, and the trial court must consider a number of circumstances that bear on the issue, including questions of reliability and prejudice. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). In this case, our examination of the considerations relevant to the trial court's decision to allow limited reference to the DNA database evidence reveals no abuse of the trial court's discretion. *People v. Jackson*, 232 Ill. 2d 246, 266-67 (2009).

¶ 71     We find further support for our holding in *People v. Jackson*, 304 Ill. App. 3d 883 (1999). In that case, the defendant claimed that the trial court erred in admitting the testimony of an evidence technician who indicated that the defendant's fingerprints were on file with a computer database. *Id.* at 894. The defendant, as here, argued that such testimony improperly implied his involvement in other crimes. *Id.* This court, citing *People v. Hopkins*, 229 Ill. App. 3d 665, 676 (1992), found that a law enforcement officer's isolated and ambiguous statement that he obtained a defendant's fingerprints from a state agency's database does not by itself indicate that the defendant has a criminal background. *Jackson*, 304 Ill. App. 3d at 894. The court noted that the evidence technician testified that he obtained the defendant's fingerprints from the Automated Fingerprint Identification System (AFIS), a computer database that uses the state's crime lab. *Id.* at 895. He further stated that the AFIS database contains fingerprints of every individual arrested, police officers, and government employees. *Id.* The technician made no other reference to the source of defendant's fingerprints and the State never mentioned that the defendant had prior arrests or convictions. *Id.* The trial court found that because of the ambiguity of the technician's testimony, the jury could believe that defendant was a former government employee. *Id.* Thus, the appellate court held that it was as "pure speculation" to infer from this reference to the computer database source that defendant had a criminal history, and there was no error. *Id.*

¶ 72     Similarly, in this case, neither the State nor the interviewing officer indicated that defendant's DNA was on file in the State's database because defendant was previously convicted of a criminal offense. Like the AFIS in *Jackson*, 304 Ill. App. 3d at 895, the Combined DNA Index System (CODIS) database contains several different indexes, not all of which are criminally based. *Jackson*, 232 Ill. 2d at 271. Accordingly, any inference of past criminal wrongdoing from the reference to defendant's DNA being on file in the database is "pure speculation." *Id.* at 270; *Jackson*, 304 Ill. App. 3d at 895. Accordingly, we find no error.

¶ 73     Defendant next contends that the video recording played for the jury improperly shifted the burden of proof because it ended with the detective asking him "Ok. What's your side?" He maintains that this statement allowed the State to direct attention to defendant's silence in violation of his constitutional right to remain silent.

¶ 74     We observe that defendant never objected to this statement before trial, when it was presented at trial, or in a posttrial motion. As stated, in order to preserve an issue for appeal, defendant must specifically object at trial and raise the specific issue again in a posttrial motion. *People v. Woods*, 214 Ill. 2d 455, 470 (2005). Nonetheless, we find that in this case, defendant chose to speak with the authorities and did not invoke his right to remain silent. Where defendant has not invoked the right to remain silent but has given a statement to the

authorities, it cannot be said that defendant is relying on the assurance that his silence will not be used. *People v. Bock*, 242 Ill. App. 3d 1056, 1072 (1993).

¶ 75    Moreover, the appropriate test for determining whether a defendant's right to remain silent has been violated is whether " 'the reference [was] intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify.' " *People v. Dixon*, 91 Ill. 2d 346, 350 (1982) (quoting *People v. Hopkins*, 52 Ill. 2d 1, 6 (1972)). In this case, the State did not draw attention to defendant's silence or the question that concluded the videotaped interview. Furthermore, there is no indication that the question was "intended or calculated to direct the attention of the jury to defendant's" right to testify. Accordingly, we find no error.

¶ 76                                    E. Cumulative Error

¶ 77    Finally, defendant argues that reversal is warranted based on the cumulative errors that occurred in this case. However, because we have found no individual errors, we reject defendant's cumulative error claim. See *People v. Doyle*, 328 Ill. App. 3d 1, 15 (2002) ("Where the alleged errors do not amount to reversible error on any individual issue, there generally is no cumulative error.").

¶ 78                                    III. CONCLUSION

¶ 79    For the reasons stated, we affirm the trial court's judgment.

¶ 80    Affirmed.